IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIXX ALDERETTE and KIXX ALDERETTE, JR.,)
               Plaintiffs,             )
                                   )
vs                            )      Civil Action No. 18-958
                                   )
LAWRENCE COUNTY CAREER AND        )
TECHNICAL CENTER, et al.,             )
               Defendants.     )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Kixx Alderette and his son, Kixx Alderette, Jr. ("Plaintiff Jr."), bring this action against Defendants, Lawrence County Career and Technical Center ("the Center"), Center Director Leonard Rich and New Castle Area School District Superintendent John J. Sarandrea, raising claims under the Rehabilitation Act, 29 U.S.C. § 794, civil rights claims under the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983, and Pennsylvania law.  Plaintiffs allege that: 1) during the 2015-2016 school year, Plaintiff Jr. was harassed by a group of boys at the Center—including an incident where he was assaulted and suffered a concussion and a broken wrist—and nothing was done about it, despite requests being made to Director Rich; 2) when Plaintiff and his wife met with Superintendent Sarandrea to discuss these issues on March 16, 2016, Sarandrea called the police and falsely reported that Plaintiff had threatened him, which resulted in Plaintiff's arrest, being charged with disorderly conduct and being barred from going on any school district property or premises; and 3) after Plaintiff Jr. addressed a School Board of Directors meeting on February 20, 2018 and discussed the bullying he had endured, Sarandrea sent him an insulting message via social media.

Presently pending before the Court are two motions to dismiss.  Sarandrea has filed a motion to dismiss Counts III (free speech and retaliation) and V (intentional infliction of

emotional distress) of the Amended Complaint in their entirety and Count VI (malicious prosecution) as to him in his official capacity, leaving only Count VI against him in his individual capacity. The Center and Rich seek dismissal of all claims asserted against them (Counts I, II and IV) or, in the alternative, severance of the claims asserted against them from the claims asserted against Sarandrea. For the reasons that follow, the motion filed by Sarandrea will be granted with respect to Count V in its entirety and Counts III and VI in Sarandrea's official capacity, but denied as to Count VI in Sarandrea's individual capacity, the motion filed by the Center and Rich will be granted with respect to Counts II and IV and denied with respect to Count I and the motion to sever will be granted.

Facts

The New Castle Area School District sends students to the Center for educational opportunities and Plaintiff Jr. applied to take classes at the Center during the 2015-2016 school year. (Am. Compl. ¶¶ 13, 20-21.)[1] Plaintiff Jr. suffers from a severe condition called pectus excavatum, in which the breastbone is sunken into the chest. The condition began to affect his breathing and required surgery, during which a metal bar was placed into his chest. (Am. Compl. ¶¶ 14-15.) Plaintiffs indicate that both the School District and the Center were made aware of his condition and that there was an individualized education plan (IEP) and disability records relating to the metal bar in his chest, which limited the amount of physical education he could receive because too much contact could cause the bar to puncture his lung or heart. (Am. Compl. ¶¶ 18-24.) However, Plaintiffs allege that, although Director Rich attended a meeting with Plaintiff and his wife at which they explained the situation, no other teachers or students at

_____

[1] ECF No. 19.

the Center were informed of Plaintiff Jr.'s disability and accommodations were never made. (Am. Compl. ¶¶ 23-26.)

Bullying of Plaintiff Jr.

On numerous occasions during the 2015-2016 school year, Plaintiff Jr. was bullied by a group of boys at the Center. They called him "stupid" and "Nazi" during school and held loud-playing music to his ear in an intimidating manner on the bus. Both Plaintiff Jr. and his parents notified Director Rich about these incidents. (Am. Compl. ¶¶ 27-29.) On December 10, 2015, Plaintiff Jr. told Director Rich that he was going to be attacked after school by this same group of boys. Director Rich required him to point to the individuals while they were in the cafeteria and he did so. The boys saw Plaintiff Jr. pointing at them. Director Rich said he would "take care of it." (Am. Compl. ¶¶ 30-34.)

Later that same day, Plaintiff Jr. was attacked by this group of boys at a bus stop. He was hospitalized and diagnosed with a concussion and a broken wrist as a result of the attack. Director Rich was aware of the attack, but the boys were never disciplined. (Am. Compl. ¶¶ 35-38.) When Plaintiff Jr. was released from the hospital, he returned to the Center, but was again bullied by this same group of boys. They would reenact the assault in the cafeteria and punch their hands close to his face in an intimidating manner. Plaintiff Jr.'s parents demanded disciplinary action against the boys, but Director Rich denied their requests. (Am. Compl. ¶¶ 39-43.)

Plaintiff Jr. had a Post-Traumatic Stress Disorder (PTSD) episode, in which he was unconscious for over three hours. The doctors at UPMC Children's Hospital called Children and Youth Services to file a report on the Center and the School District, through the mandated reporting childline number, out of concern for the lack of care being provided by the District and

3

the Center.  The doctors recommended that Plaintiff Jr. see a psychiatrist and counselor for his PTSD.  The psychiatrist, Dr. M. McCray Ashby, diagnosed him as suffering from PTSD and the counselor, Krista Armstrong, put him on "homebound" instruction for the remainder of the school year in May 2016.  (Am. Compl. ¶¶ 44-49.)  As a result, Plaintiff Jr. withdrew from the school and finished the year in cyber school.  He continues to suffer from emotional and psychological trauma and continues to seek counseling for his PTSD.  (Am. Compl. ¶¶ 50-51.)

Arrest of Plaintiff

Plaintiff and his wife met with Superintendent Sarandrea to discuss some of the issues that had occurred with their son at the Center on or about March 16, 2016.  During the meeting, Sarandrea indicated that he was upset about social media postings relating to him and comments by Plaintiff about hiring a lawyer.  At the end of the meeting, Plaintiff informed Sarandrea that he was hiring a lawyer and that Sarandrea would regret it.  Sarandrea stated that he was going to call the police on Plaintiff for making threats.  After the meeting, Sarandrea called the police and falsely reported that Plaintiff was threatening him, being belligerent and had used the expletive "f-k" during the meeting.  Based on this information, Plaintiff was arrested, charged with disorderly conduct and barred from going on any District property or premises or risk being arrested.  In an effort to defend himself, Plaintiff subpoenaed Sarandrea, the Assistant Superintendent and the Secretary.  None of these witnesses appeared in court, and the charges were dismissed on July 22, 2016.  (Am. Compl. ¶¶ 52-59.)

School Board Incident

On February 20, 2018, the Board of Directors held its monthly public meeting.  Plaintiff Jr. prepared a speech to give to the Board to discuss bullying and some of the trauma that he and his family endured.  After he spoke, Plaintiff Jr. left the meeting.  Superintendent Sarandrea was

present at the meeting and heard Plaintiff Jr.'s comments, some of which were criticisms of him. At approximately 12:36 a.m. the next morning, Sarandrea sent Plaintiff Jr. a message through his social media page. The message referred to him as "Kicks" rather than "Kixx." He continued his insults by writing "It is nice to see you become a chip off the block and following the example of blaming others for your shortcomings." Sarandrea further ridiculed Plaintiff Jr.'s speech impediment by signing his own name "Salandrea," which was how Plaintiff Jr. pronounced it during the Board meeting, under stress and intimidation. (Am. Compl. ¶¶ 60-67.) Plaintiffs allege that Sarandrea's conduct caused Plaintiff Jr. loss of sleep and appetite and exacerbated his PTSD. (Am. Compl. ¶ 102.)

Procedural History

Plaintiffs filed this action on July 21, 2018. Named as defendants were the Center,[2] Rich, Sarandrea, the New Castle Area School District and the New Castle Area School District Board of Directors. On October 12, 2018, the School District, Board of Directors and Sarandrea filed a motion to dismiss (ECF No. 10) and on October 15, 2018, the Center and Rich filed a motion to dismiss or sever (ECF No. 13).

In response, Plaintiffs filed an Amended Complaint on November 2, 2018 (ECF No. 19), which removed the School District and Board of Directors, but retained Sarandrea. Jurisdiction is based on the federal questions presented by the Rehabilitation Act and civil rights claims, 28 U.S.C. § 1331 (Am. Compl. ¶ 15). In Count I, Plaintiff Jr. alleges a claim under the Rehabilitation Act against the Center. Count II alleges a violation of Plaintiff Jr.'s substantive

_____

[2] In the original complaint, this defendant was identified as "Lawrence County Career and Technology Center," but in the Amended Complaint, the word "Technology" has been changed to "Technical." In its brief, the Center continues to refer to itself with the word "Technology."

due process right to bodily integrity against Rich.  In Count III, Plaintiff Jr. alleges First Amendment claims of free speech and retaliation against Sarandrea.  In Count IV, Plaintiff Jr. alleges a procedural due process claim against Rich.  Count V alleges a claim of intentional infliction of emotional distress ("IIED") on behalf of both Plaintiffs against Sarandrea.  In Count VI, Plaintiff alleges a claim of malicious prosecution against Sarandrea.

On November 9, 2018, Sarandrea filed a motion to dismiss (ECF No. 21), seeking dismissal of all claims against him except the malicious prosecution claim in his individual capacity.  On November 27, 2018, Plaintiffs filed a brief in opposition (ECF No. 27).  On November 19, 2018, the Center and Rich filed a motion to dismiss or sever (ECF No. 24).  On December 4, 2018, Plaintiffs filed a brief in opposition (ECF No. 28).

Standard of Review

The Supreme Court has issued two decisions that pertain to the standard of review for failure to state a claim upon which relief could be granted.  The Court held that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (citations omitted).  Mere "possibilities" of

misconduct are insufficient.  Id. at 679.  The Court of Appeals has summarized the inquiry as

follows:

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

Sarandrea's Motion

Sarandrea argues that: 1) Count III should be dismissed because, when a public official is

alleged to have violated an individual's First Amendment rights by means of speech, the

official's own First Amendment right to speak comes into play and, unless the official engaged

in threats, coercion or acts of intimidation (not alleged here), his speech rights prevail; 2) Count

V should be dismissed because Plaintiff Jr. alleges no physical harm or outrageous conduct; 3)

all claims against him in his official capacity should be dismissed because they are really against

the School District, which has been dismissed from the case; 4) he is entitled to sovereign

immunity in his official capacity with respect to Counts V and VI; and 5) he has qualified

immunity with respect to Count V in his individual capacity.

Plaintiffs concede that all claims against Sarandrea in his official capacity should be

dismissed.  (ECF No. 27 at 6.)  However, they argue that: 1) Sarandrea's speech was not on a

matter of public concern and it is therefore not protected; 2) Plaintiff Jr. suffered PTSD, a form

7

of physical harm, and Sarandrea's conduct can legitimately be described as outrageous; and 3) qualified immunity does not apply to Sarandrea's willful misconduct.

Count III: Free Speech and Retaliation

In Count III, Plaintiffs allege that Sarandrea's conduct deprived Plaintiff Jr. of his right to free speech and retaliated against him for exercising that right. Sarandrea argues that, because his own actions took the form of speech, Plaintiffs' allegations are insufficient to state a claim.

In Conard v. Pennsylvania State Police, 902 F.3d 178 (3d Cir. 2018), the plaintiff brought suit against her former employer (the Pennsylvania State Police) and two supervisors, alleging that they had retaliated against her for her act of filing a previous civil rights action against them by providing "negative, false and defamatory" statements to potential employers in response to reference requests. The district court granted the defendants' motion to dismiss, but the Court of Appeals reversed.

First, the court held that the framework for First Amendment claims brought by government employees against their employers did not apply to Conard's retaliation claim because the speech which she alleged triggered the retaliation against her (filing a lawsuit against her former employer) occurred after she left State Police employment. Second, the court held that Conard was not required to plead that the defendants engaged in retaliatory conduct "of a particularly virulent nature," a standard applicable to retaliation claims where the conduct involves speech by a public employee defendant, because the defendants' speech did not touch upon a matter of public concern.

Rather:

"To plead a plausible First Amendment retaliation claim, Conard was required to allege three elements: (1) "[she engaged in] constitutionally protected conduct, (2) [there was] retaliatory action sufficient to deter a person of ordinary firmness

8

from exercising [her] constitutional rights, and (3) [there was] a causal link
between the constitutionally protected conduct and the retaliatory action."

Id. at 183 (quoting Mirabella v. Villard, 853 F.3d 641, 649 (3d Cir. 2017)).  The court concluded

that: 1) there was no doubt that Conard's conduct was constitutionally protected; 2) she plausibly

alleged a causal link particularly because there is no bright line rule limiting the amount of time

that may pass between a plaintiff's protected speech and an actionable retaliatory action; and 3)

the district court erred in holding that the negative references Conard received could not satisfy

the "deterrence" element, given that the court has held that First Amendment retaliation claims

are individually actionable even when relatively minor and that the deterrence threshold to chill a

plaintiff from exercising her First Amendment rights is "very low."  Id. at 184.

The Conard case also describes a test to determine whether the defendant's action

contained "a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse

regulatory action would follow."  Id. at 183 (quoting Mirabella, 853 F.3d at 651).  However, it is

unclear whether this represents an example of the "virulent character" test (as Plaintiffs contend)

or yet another test, under which Plaintiffs' allegations would be insufficient (as Sarandrea

argues).  The court in Conard stated that it was applying the regular test for retaliation claims as

described in Mirabella and does not apply the "threat, coercion, or intimidation" test despite

having discussed it.  Indeed, it is difficult to imagine how a negative reference (the defendant's

retaliatory conduct in that case) could ever be described as constituting a "threat, coercion, or

intimidation," yet the Supreme Court has held that employees can maintain a cause of action for

discrimination against former employers, whose acts almost invariably involve providing

negative references.  Robinson v. Shell Oil Co., 519 U.S. 337 (1997).

9

In this case, Sarandrea's alleged speech was not on a matter of public concern and therefore the virulent character test does not apply. Plaintiff Jr.'s speech at a School Board meeting was constitutionally protected, Sarandrea responded a few hours later (meeting the element of plausible causation) and Sarandrea's actions could plausibly deter him from exercising his First Amendment rights. Therefore, the Amended Complaint states a claim and, with respect to Count III, Sarandrea's motion to dismiss will be denied.

Count V: IIED

In Count V, Plaintiffs allege that Sarandrea's conduct subjected them to IIED. Sarandrea argues that these allegations fail to state a claim, both because his conduct was not outrageous and because Plaintiffs did not suffer physical harm. Plaintiffs respond that Plaintiff Jr. suffers from PTSD, a form of physical harm, and that Sarandrea's actions with respect to Plaintiff Jr. can be described as outrageous.[3]

PTSD is a form of physical harm for purposes of a claim of IIED. See Kane v. Chester County Dep't of Children, Youth and Families, 10 F. Supp. 3d 671, 693 (E.D. Pa. 2014) (citing Vicky M. v. Northeastern Ed. Intermediate Unit 19, 486 F. Supp. 2d 437, 458 (M.D. Pa. 2007), on reconsideration, 2007 WL 2844428 (M.D. Pa. Sept. 26, 2007)); Schmidt v. Boardman Co., 11 A.3d 924, 958 & n.4 (Pa. 2011) (Baer, J., concurring in part). However, Sarandrea's other argument is prevailing.

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm

---

[3] The Amended Complaint alleges IIED claims on behalf of both Plaintiff and Plaintiff Jr. and Sarandrea moves to dismiss the claims in their entirety. But in their response, Plaintiffs discuss only the claim brought by Plaintiff Jr. arising out of the Board meeting incident. (ECF No. 20 at 5.)

to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46(1)

(1965). Although the Pennsylvania Supreme Court has never expressly adopted this section of

the Restatement, it has pointed to the Restatement's definition to describe the level of behavior

necessary to maintain such a claim. Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998). The court

observed that:

> courts have been chary to allow recovery for a claim of intentional infliction of
> emotional distress. Only if conduct which is extreme or clearly outrageous is
> established will a claim be proven. Indeed our Superior Court has noted, "[t]he
> conduct must be so outrageous in character, and so extreme in degree, as to go
> beyond all possible bounds of decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized society." Buczek v. First National Bank of
> Mifflintown, 366 Pa. Super. 551, 558, 531 A.2d 1122, 1125 (1987). Described
> another way, "[i]t has not been enough that the defendant has acted with intent
> which is tortious or even criminal, or that he has intended to inflict emotional
> distress, or even that his conduct has been characterized by 'malice,' or a degree
> of aggravation that would entitle the plaintiff to punitive damages for another
> tort." Restatement (Second) of Torts § 46, comment d; Daughen v. Fox, 372 Pa.
> Super. 405, 412, 539 A.2d 858, 861 (1988).

Id. at 753-54.

Only a few cases have presented behavior so "outrageous" that courts have been willing

to allow a claim for intentional infliction of emotional distress. See Papieves v. Lawrence, 263

A.2d 118 (Pa. 1970) (defendant stuck and killed the plaintiffs' son with a car, failed to seek

medical attention, and buried the body in a field); Banyas v. Lower Bucks Hosp., 437 A.2d 1236

(Pa. Super. 1981) (plaintiff was involved in a fight which resulted in the other participant

receiving a broken jaw that required surgery, but the person died during surgery due to hospital

negligence; the hospital falsified the records and the plaintiff was charged with murder); Chuy v.

Philadelphia Eagles Football Club, 595 F.2d 1265 (3d Cir. 1979) (team physician falsely

reported to the media that football player had a fatal disease).

Sarandrea's alleged behavior of sending an insulting message to a former student, while hardly appropriate for a school superintendent, cannot be said to rise to the level of outrageous behavior that courts have found to state a claim for IIED. Therefore, with respect to Count V, the motion to dismiss will be granted.[4]

In summary, Sarandrea's motion will be granted with respect to Count V in its entirety and Counts III and VI against him in his official capacity but denied as to Counts III and VI in his individual capacity.

<u>Motion to Dismiss by Center and Rich</u>

In their motion, the Center and Rich argue that: 1) Count I does not allege that Plaintiff Jr. is "qualified" for purposes of the Rehabilitation Act, nor that he was denied programs or activities, and there was no plan; 2) Count II should be dismissed because Rich had no concrete knowledge that Plaintiff Jr. would be injured off school grounds, he engaged in no culpable behavior that shocks the conscience, there was no contact between him and Plaintiff Jr. to inform him in advance of the attack and he took no affirmative acts but is only alleged to have failed to act; 3) Count IV fails to cite a "legal vehicle" by which the procedural due process claim is asserted; and 4) Rich is entitled to qualified immunity.

Plaintiffs respond that: 1) the Amended Complaint appropriately alleges that Plaintiff Jr. was disabled but otherwise qualified to participate in school activities, and that the School District and Center were notified of his condition but did not relay this information to anyone; 2) the Amended Complaint alleges that Director Rich was specifically notified by Plaintiff Jr. that he would be attacked on a certain day and he was, and the fact that the injury he suffered was not

_____

[4] The Court need not address Sarandrea's alternative argument that he is entitled to qualified immunity with respect to this claim.

directly related to the bar in his chest is irrelevant, and a school bus stop does constitute school property; 3) Plaintiff Jr. was denied his right to education when Rich failed to conduct any investigation into the bullying incidents; 4) it was clearly established at the time that the actions alleged would deprive Plaintiff Jr. of his rights to bodily integrity and education.

Count I: Rehabilitation Act Claim

In Count I, Plaintiff Jr. alleges that the Center violated his right to educational services under the Rehabilitation Act. The Center argues that this claim is insufficient because there is no causal link between Plaintiff Jr.'s IEP, the metal bar or the assault and it is not alleged that the parents ever requested a section 504 Plan. Plaintiffs respond that they have adequately alleged a claim.

Section 504 of the Rehabilitation Act provides that:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

29 U.S.C. § 794(a).

The Court of Appeals has held that:

In order to establish a violation of § 504 of the Rehabilitation Act, a plaintiff must prove that (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995) (quoting Nathanson v. Medical

College of Pennsylvania, 926 F.2d 1368, 1380 (3d Cir. 1991)). In addition, the plaintiff must demonstrate that defendants know or should be reasonably expected to know of his disability. See id. But a plaintiff need not prove that defendants' discrimination was intentional. See id.

Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 253 (3d Cir. 1999).

The Amended Complaint alleges that Plaintiff Jr. has the disability of pectus excavatum,[5] that the Center knew about his disability, that he was otherwise qualified to participate in school activities, and that he was denied the benefits of receiving an education in a harassment-free environment and had to finish the school year in a cyber school.  The Center contends that the Amended Complaint misleadingly refers to an IEP, but that it concerned Plaintiff Jr.'s speech impediment and was not related to the bar in his chest.  However, this information goes beyond (and contradicts) the allegations of the Amended Complaint and thus it is not appropriately considered at this stage of the proceedings.  Plaintiffs have stated a claim under section 504 of the Rehabilitation Act and with respect to Count I, the motion to dismiss will be denied.

Count II: Substantive Due Process Claim

In Count II, Plaintiffs allege that Director Rich is liable for violation of Plaintiff Jr.'s substantive due process right to bodily integrity under the state-created danger theory.  Rich contends that, although the Amended Complaint purports to state a claim under the state-created danger theory, it fails to do so.

In Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992), the Supreme Court rejected a claim asserted on behalf of a sanitation worker who died of asphyxia after entering a manhole to unstop a sewer line because "the Due Process Clause does not impose an

─────────────────

[5] As Plaintiffs observe, the Center's argument that they have not identified Plaintiff Jr.'s disability appears to have been copied from the motion to dismiss the original Complaint, which has been superseded by the Amended Complaint.

independent federal obligation upon municipalities to provide certain minimum levels of safety and security in the workplace." Id. at 130. As the Supreme Court has stated:

> Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196-97 (1989) (citations and footnote omitted). Thus, no liability attached when county authorities, although aware that Joshua DeShaney might be a victim of child abuse, nevertheless returned him to the custody of his father, who beat him to the point that he suffered severe brain damage.

The Court of Appeals has noted that:

> DeShaney stands for the proposition that the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody. [H]owever, this does not mean that no constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him "more vulnerable to injury from another source than he or she would have been in the absence of state intervention." Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003). This complement to the DeShaney holding has come to be known in its progeny as the "state-created danger doctrine."

Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (footnote omitted).

The Court of Appeals has adopted a four-part test for the state-created danger theory:

> 1. the harm ultimately caused was foreseeable and fairly direct;
> 2. a state actor acted with a degree of culpability that shocks the conscience;
> 3. a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> 4. a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

L.R. v. School Dist. of Philadelphia, 836 F.3d 235, 242 (3d Cir. 2016) (citing Bright, 443 F.3d at 281). In L.R., the court held that a parent of a kindergarten student stated a claim under the state-created danger theory when a teacher allowed an unidentified adult to take the girl from the classroom and she was sexually assaulted. On the other hand, in Morrow v. Balaski, 719 F.3d 160 (3d Cir. 2013) (en banc), the court held that the plaintiffs could not state a claim under the state-created danger theory when their daughters were continually bullied in their high school. The plaintiffs argued that the school had rendered the daughters more vulnerable to danger by merely suspending the bully, rather than expelling her as required by school policy, and by allowing the bully to board the daughters' school bus despite a no-contact order. But the court rejected these arguments, holding that they represented mere failures to act restated as affirmative acts. Id. at 177-79. See also Stiles ex rel. D.S. v. Grainger County, Tenn., 819 F.3d 834, 854-55 (6th Cir. 2016) (failing to punish students, failing to enforce the law or school policy and failing to refer assaults to appropriate person were all omissions rather than affirmative acts and even misleading victim into believing that defendants would help merely returned him to a preexisting situation of danger).

In Morse v. Lower Merion School District, 132 F.3d 902 (3d Cir. 1997), the Court of Appeals held that the school district did not place a teacher in a dangerous environment stripped of means to defend herself and did not place her in a unique confrontational encounter when it allowed construction workers to use an unlocked back entrance to the school building, and a mentally unstable woman entered through this door and shot her. Their actions did increase the risk of harm, but this was not sufficient and the increased risk did not relate directly to the harm the teacher suffered. Id. at 914-15. See also Page by Page v. School Dist. of Phila., 45 F. Supp. 2d 457, 465 (E.D. Pa. 1999) (school officials did not meet fourth element when they failed to

prevent attack on middle school student by other students, even when they had entered into an agreement with the parents of the victim to prevent her from being harmed). Cf. <u>Maxwell by Maxwell v. School Dist. of City of Phila.</u>, 53 F. Supp. 2d 787, 793 (E.D. Pa. 1999) (special education student met fourth element when school district defendants locked the classroom door, preventing her from leaving, teacher told disruptive students they could do what they wanted to as long as they did not bother her, teacher witnessed attempted rape of another student but did nothing and teacher saw two students take plaintiff and blackboard to the back of the room where they raped her but did nothing). See also <u>Phillips</u>, 515 F.3d at 236-37 (when plaintiff alleged that co-workers provided 911 call center employee with information that he used to trace and shoot his former girlfriend, her new boyfriend and the girlfriend's sister, this was sufficient to state the affirmative act necessary to maintain a state-created danger theory of liability).

Rich argues that none of the elements are sufficiently pleaded: 1) Plaintiffs provide no basis for him to have been aware that Plaintiff Jr. would suffer a concussion at the hands of unidentified students while not in school or even in the vicinity; 2) there is no basis for finding Rich's behavior (being subsequently aware of the attack and not disciplining the bullies) conscience shocking; 3) there is no basis for Rich to have been aware that Plaintiff Jr. was a foreseeable victim; and 4) Rich is alleged only to have failed to act, not to have engaged in affirmative acts that made Plaintiff Jr. more vulnerable to harm.[6]

Plaintiffs contend that they have stated a claim under the state-created danger theory: Rich told Plaintiff Jr. to point to the boys who were bullying him and he did so and they saw him

---

[6] Rich has selectively cited only those portions of the Amended Complaint that deal with what happened after the attack, not Plaintiff Jr.'s assertion that he told Rich about it beforehand and was directed to point to the bullies.

do it and attacked him that same day, there was "some relationship" between Director Rich (the head of the Center) and Plaintiff Jr., Director Rich acted in willful disregard for Plaintiff Jr.'s safety by making him point to the boys in their presence and indicating that he would "take care of the situation" and this incident increased his vulnerability for harm. Plaintiffs also note that, under Pennsylvania law, a school bus stop does constitute school property with respect to acts of bullying. 24 P.S. § 13-1303.1-A(e).

This is a close case, and these allegations might be sufficient to state a claim under the state-created danger theory: prior to December 10, 2015, the group of boys had insulted Plaintiff Jr. and played loud music near him to intimidate him, but had not physically assaulted him; the bullies are alleged to have seen him point them out to Rich in the cafeteria and had then physically assaulted him after school, resulting in him being hospitalized for a concussion and a broken wrist. The Amended Complaint could be said to allege that Rich's actions placed Plaintiff Jr. in a more vulnerable position than he was already in. Morse, 132 F.3d at 915.

On the other hand, based on what Plaintiff Jr. told Rich that day, the bullies had announced that they were going to attack him and they did, so it could be argued that Rich's action of having Plaintiff Jr. point to them in the cafeteria left him in the same position he would have been in prior to doing so. See Morrow, 719 F.3d at 178-79 (failing to expel bully as mandated by school policy did not increase the vulnerability of the victims); Lansberry v. Altoona Area Sch. Dist., 318 F. Supp. 3d 739, 755-56 (W.D. Pa. 2018) (school's failure to respond to bullying and teacher who told victim to stop being a "baby" and prevented him from visiting a guidance counselor did not constitute affirmative acts that render him more vulnerable to take his own life); Morgan v. Town of Lexington, Mass., 823 F.3d 737, 744 (1st Cir. 2016) (no affirmative acts when principal refused to let victim run in a track meet because he delayed

the investigation, when officers were sent to victim's house because he refused to go to school and when a school official told the plaintiffs that there was not time to discuss specific incidents); D.S. v. East Porter County Sch. Corp., 799 F.3d 793, 798-99 (7th Cir. 2015) (failure to respond to bullying did not increase the danger to the victim); McQueen v. Beecher Community Sch., 433 F.3d 460, 466 (6th Cir. 2006) (state-created danger theory does not apply if "the victim would have been in about the same or even greater danger even if the state officials had done nothing.").

In any event, even if the allegations could be said to state a claim under the state-created danger theory, Plaintiffs cannot overcome Rich's qualified immunity defense.

Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is an objective decision to be decided by the court as a matter of law. Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004). Moreover, the Supreme Court has stressed that the qualified immunity question must be resolved "at the earliest possible stage in the litigation." Saucier v. Katz, 533 U.S. 194, 201 (2001).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The ultimate question is whether the state of the law when the offense occurred gave Rich "fair

warning" that his acts were unconstitutional.  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

The court should look first to applicable Supreme Court precedent. "Even if none exists, it may be possible that a 'robust consensus of cases of persuasive authority' in the Court[s] of Appeals could clearly establish a right for purposes of qualified immunity."  Mammaro v. New Jersey Div. of Child Protection & Permanency, 814 F.3d 164, 169 (3d Cir. 2016) (quoting Taylor v. Barkes, 135 S.Ct. 2042, 2044 (2015)).

Defining the right at issue is critical to this inquiry. The court must frame the right "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201.  "The dispositive question is whether the violative nature of particular conduct is clearly established." Mullenix v. Luna, 136 S.Ct. 305, 308 (2015).  But this does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.  The Supreme Court has explained that, "[a]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Hope, 536 U.S. at 741. Indeed, the Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id.

Plaintiffs have not pointed to any case which would have put Rich on notice that the law was clearly established in 2015 that his actions violated Plaintiff Jr.'s rights, and this Court's own research into the matter suggests that the opposite is true.[7] As noted above, the Court of Appeals held in Morrow that school officials could not be held liable for failing to adequately

_____

[7] Indeed, Plaintiffs' brief merely identifies the elements of a state-created danger theory claim and qualified immunity and makes policy arguments for why Rich's actions render him liable. This is insufficient.  See Lansberry, 318 F. Supp. 3d at 757 n.17.

respond to acts of bullying and only held that a school teacher could be liable in <u>L.R.</u> because he took the affirmative act of handing over a kindergartener to an unidentified stranger, which unquestionably increased her vulnerability to danger.  See also <u>Shively v. Green Local Sch. Dist. Bd. of Educ.</u>, 579 F. App'x 348, 356 (6th Cir. 2014) (noting that federal cases had not found schools officials liable for student-on-student harassment, so they were entitled to qualified immunity).

Therefore, with respect to Count II, the motion to dismiss will be granted.

<u>Count IV: Procedural Due Process</u>

In Count IV, Plaintiffs allege that Rich's failure to investigate and execute the Center's policy regarding bullying denied Plaintiff Jr. his right to education as established under Pennsylvania law.  Rich argues that this claim fails to identify a "legal vehicle" or what process was due.  Plaintiffs respond that they have identified the right at issue (education) and the process that was due (investigating the incidents and following the anti-bullying policy).

It is provided in 42 U.S.C. § 1983[8] that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979).  "The

---

[8] Although § 1983 is not expressly cited in Count IV, it is cited in the "relevant laws and policies" section of the Amended Complaint (ECF No. 19 ¶ 10), in Count II and in the cases that Plaintiffs cite in their brief.

first step in any such claim is to identify the specific constitutional right allegedly infringed."
Albright v. Oliver, 510 U.S. 266, 271 (1994). See also Baker, 443 U.S. at 140; Graham v.
Connor, 490 U.S. 386, 394 (1989).

The Fourteenth Amendment provides that states shall not "deprive any person of life,
liberty, or property, without due process of law; nor deny to any person within its jurisdiction the
equal protection of the laws." U.S. Const. amend. XIV. "Protected interests in property are
normally 'not created by the Constitution. Rather, they are created and their dimensions are
defined' by an independent source such as state statutes or rules entitling the citizen to certain
benefits." Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 149 (3d Cir. 2005)
(citing Goss v. Lopez, 419 U.S. 565, 572-73 (1975)). Under Pennsylvania law, a student has a
"legitimate claim of entitlement to a public education." Id. at 149 n.3 (citing 22 Pa. Code
§ 12.8(a)).[9]

In A.B. v. Montgomery Area School District, 2012 WL 3288113 (M.D. Pa. Aug. 10,
2012), a minor brought suit through his parents alleging that the school district had, inter alia,
denied him his due process right to education by failing to address bullying that he suffered at
the school. The court, after noting that it had previously denied a motion to dismiss filed by the
defendant (id. at *1), granted the defendant's motion for summary judgment because the
developed record established that the administrators investigated the bullying incidents,
disciplined the offenders and the plaintiff presented no evidence that his education was interfered
with or that he suffered academically (id. at *7). In this case, by contrast, Plaintiffs have alleged

_____

[9] Education is not a fundamental right for purposes of the substantive due process clause. See
San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 33-38 (1973).

that Rich failed to investigate or discipline the offenders and that Plaintiff Jr.'s education was interfered with, allegations that must be accepted as true at this stage of the proceedings.

However, as Rich argues, Plaintiffs have not explained what process was "due," an issue that was not discussed in the A.B. case because the plaintiff was not prohibited from participating in school activities or deprived of benefits and opportunities associated with public education. Id. at *7. Plaintiffs respond that Rich failed to follow through and investigate allegations of bullying.

"Once it is determined that due process applies, the question remains what process is due." Goss, 419 U.S. at 577 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). In Goss, the Supreme Court held that the due process clause required a school district to provide, with respect to a suspension of 10 days or less, notice to the student of the charges against him and an opportunity to present his side of the story. Id. at 581. In Shuman, the Court of Appeals held that this standard was met. 422 F.3d at 149-50. In this case, by contrast, Plaintiff Jr. was not suspended or expelled.

Plaintiffs contend that Rich failed to follow established policies for dealing with bullying, but the determination of what process is "due" is "not to be found in statutes … [but] is a question of federal constitutional law." McDaniels v. Flick, 59 F.3d 446, 458 (3d Cir. 1995) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Matthews v. Eldridge, 424 U.S. 319, 333 (1976) (citation omitted). But it would make no sense to apply these standards to the factual situation in this case and suggest that Rich should have provided Plaintiff Jr. with notice and an opportunity to be heard before the group of boys bullied him to the extent that his education was interfered with. In fact, according

to the Amended Complaint, both Plaintiff and Plaintiff Jr. did complain about the bullying, even if Rich did not take action in response. Thus, the facts of this case simply do not state a claim under the procedural due process clause.

Moreover, as with Count II, Plaintiffs fail to cite any support for the argument that the right violated—namely, the right of a student to have school officials prevent other students from bullying him so severe that it interferes with his education—was clearly established in 2015. Therefore, with respect to Count IV, the motion to dismiss will be granted. As a result, both claims against Director Rich (Counts II and IV) will be dismissed and only Count I (the Rehabilitation Act claim) will remain against the Center.

<u>Motion to Sever</u>

The Center and Rich move to sever the incidents involving them from the incidents involving Sarandrea as being improperly joined because they do not involve the same transaction or occurrence or series of transactions or occurrences. Plaintiffs respond that they will abide by the Court's decision on this matter.

Federal Rule of Civil Procedure 21 states that:

> Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.

Fed. R. Civ. P. 21. Thus, the first argument made by the Center and Rich—that Plaintiffs' Complaint should be dismissed in its entirety as it does not conform with the Rule regarding joinder of parties (ECF No. 25 at 16)—is clearly foreclosed by the actual wording of the Rule and is rejected.

As a general matter, joinder of claims, parties and remedies is strongly encouraged. <u>Hagan v. Rogers</u>, 570 F.3d 146, 153 (3d Cir. 2009) (citation omitted). However, joinder is only

appropriate if both elements of Rule 20(a) are met.  <u>Lopez v. City of Irvington</u>, 2008 WL

565776, at *2 (D.N.J. Feb. 28, 2008).  That is, joinder of defendants is appropriate if: "(A) any

right to relief is asserted against them jointly, severally, or in the alternative with respect to or

arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B)

any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P.

20(a)(2).

      In this case, the Center and Rich contend that the claims against Sarandrea are completely

and factually separate from the claims against them, that there are no factual or legal issues in

common, and that the claims are not based on the same basic controversy between the parties.

As recited above, the Amended Complaint recites three separate sets of facts, two of which

involve only Sarandrea (his acts of malicious prosecuting Plaintiff in 2016 and retaliating against

Plaintiff Jr. in 2018), but only one of which involves the Center and Rich—the bullying incidents

in 2015.  Three of the claims are asserted against Sarandrea—Counts III, V and VI—while three

disparate claims are asserted against the Center and Rich—Counts I, II and IV.  The only point

they have in common is that the bullying of Plaintiff Jr. serves as a background to the reason

Plaintiff was meeting with Sarandrea in 2016 (which led to his arrest) and the reason Plaintiff Jr.

was addressing the School Board in 2018 (which led to Sarandrea's message to him).  However,

the incidents have different facts and lead to different causes of action.  Thus, it cannot be said

that these events arise out of the same transaction, occurrence or series of transactions or

occurrences or that there exists some question of fact or law common to all defendants.  <u>See</u>

<u>Garcia v. Brock-Weinstein,</u> 2014 WL 2957487, at *2 (E.D. Pa. July 1, 2014) (two separate auto

accidents involving the same plaintiff but different defendants and vehicles at different times

could not be joined in one lawsuit).

Therefore, the motion to sever will be granted and the remaining claims against

Sarandrea will be severed from the remaining claim against the Center.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIXX ALDERETTE and KIXX ALDERETTE, JR.,)
                  Plaintiffs,             )
                                           )
vs                                      )        Civil Action No. 18-958
                                         )
LAWRENCE COUNTY CAREER AND        )
TECHNICAL CENTER, et al.,             )
                  Defendants.     )

## ORDER

AND NOW, this 19th day of December, 2018, for the reasons explained in the

Memorandum Opinion above,

IT IS HEREBY ORDERED that the motion to dismiss filed by Defendant John J.

Sarandrea (ECF No. 21) is granted with respect to Count V of the Amended Complaint in its

entirety and Count VI of the Amended Complaint in Sarandrea's official capacity but denied as

to Count III and Count VI in his individual capacity.

IT IS FURTHER ORDERED that the motion to dismiss filed by Defendants Lawrence

County Career and Technical Center and Leonard Rich (ECF No. 24) is granted with respect to

Counts II and IV of the Amended Complaint and denied with respect to Count I.  Defendant

Leonard Rich is dismissed as a defendant in this action.

IT IS FURTHER ORDERED that the motion to sever filed by Defendants Lawrence

County Career and Technical Center and Leonard Rich (ECF No. 24) is granted and the

remaining claims against Defendant John J. Sarandrea (Counts III and VI of the Amended

Complaint) are severed from the remaining claim against Defendant Lawrence County Career

and Technical Center (Count I of the Amended Complaint).  The Clerk of Court is ordered to

open a separate civil action captioned *Kixx Alderette and Kixx Alderette, Jr. v. John J.*

*Sarandrea*, to assign this new case to the undersigned, and to recaption this case as *Kixx Alderette, Jr. v. Lawrence County Career and Technical Center.*

IT IS FURTHER ORDERED that, by January 4, 2018, Plaintiffs shall file Amended Complaints in both this case and newly created civil action, to reflect the claims that remain against the proper defendant in each case.

IT IS FURTHER ORDERED that the Defendants shall file answers to the Amended Complaints by January 18, 2019.

IT IS FURTHER ORDERED that a Case Management Conference is scheduled for February 8, 2019 at 9:30 a.m. in Suite 9240, United States Courthouse. Pursuant to Federal Rule of Civil Procedure 26(f), the parties are to meet at least 14 days prior to the scheduled conference date for the purposes of planning discovery and the filing of their written discovery plan, which must be filed with the Court no later than 7 days prior to the conference. In addition, pursuant to Local Rule 16.2, by that same date, the parties shall file the Stipulation Selecting ADR Process, which is available on the Court's Web site www.pawd.uscourts.gov under ADR - Alternate Dispute Resolution, ADR Program Information, ADR Stipulation Forms.

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge